UNITED STATES of America ex rel.
James P. FREE, Jr., Plaintiff,

v.

Howard PETERS, III, Michael P. Lane,
and Neil F. Hartigan, Defendants.

No. 89 C 3765.

United States District Court,
N.D. Illinois, E.D.

Nov. 5, 1991.

Kimbal Richard Anderson, Winston & Strawn, Chicago, Ill., for plaintiff.

Arleen C. Anderson, Illinois Atty. General's Office, Jack Donatelli, U.S. Attorney's Office, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The petitioner, James P. Free, Jr., is confined in the Pontiac Correctional Center's condemned unit and has filed this petition for habeas relief pursuant to 28 U.S.C. § 2254, seeking relief from both his conviction and death sentence. For the reasons that follow, we deny Free's petition for relief from his conviction and grant him relief from his death sentence.

### I. Factual Background and Procedural History

In the early morning hours of April 24, 1978, Free entered the M–2 Service Center, an all-night keypunch business located in Glen Ellyn, Illinois. Carrying a gun and a cloth bag, he encountered the only other people in the office at that time: two employees, Bonnie Serpico and Lori Rowe. Free ordered them into a back room, then forced them at gunpoint into the lunchroom, had them lie down, and told them he was going to rape them. Free bound Rowe's hands and feet with twine he had removed from the bag he was carrying, and then led Serpico into another room where he had her remove her clothes. In the meantime, Free returned to check on Rowe and found that she had managed to loosen the ropes around her hands and feet. He became angry and yanked the rope, pulling her sideways until she fell on her side. Meanwhile, Serpico got up and began to run away. Free ran back to the other room and shot Serpico. He then re-turned to the lunchroom, shot Rowe, and fled the building. After he fled, Rowe managed to crawl to a phone and call the police who arrived 15 minutes later. Serpico died due to severe blood loss from the gunshot wound.

Free was apprehended the next morning. On June 22, 1979, he was convicted of murder, attempted murder, and two counts of attempted rape. The prosecution then formally requested a capital sentencing hearing on the murder conviction, and Free submitted his jury request. In August 1979, the trial court conducted the capital sentencing hearing on the murder conviction. The jury found that Serpico was killed during the course of a rape and a burglary and that no mitigating factors existed sufficient to preclude imposition of the death sentence. The trial judge accordingly entered judgment sentencing Free to death.

On January 24, 1983, the Illinois Supreme Court affirmed Free's conviction and sentence. *People v. Free ("Free I")*, 94 Ill.2d 378, 69 Ill.Dec. 1, 447 N.E.2d 218, *cert. denied*, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Free subsequently filed two separate petitions for post-conviction relief in the Illinois state courts. The trial court dismissed each petition and the Illinois Supreme Court affirmed each dismissal. *People v. Free ("Free II")*, 112 Ill.2d 154, 97 Ill.Dec. 396, 492 N.E.2d 1269, *cert. denied*, 479 U.S. 871, 107 S.Ct. 246, 93 L.Ed.2d 170 (1986); *People v. Free ("Free Ill")*, 122 Ill.2d 367, 119 Ill.Dec. 325, 522 N.E.2d 1184, *cert. denied*, 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). Having exhausted all available state remedies in satisfaction of 28 U.S.C. § 2254(b), Free filed this habeas petition raising 21 separate grounds for relief (individually designated as "Ground __"). Illinois has stayed execution pending the final disposition of this petition. To the extent necessary, we shall set forth additional facts that may be relevant to individual issues raised by Free's petition.

### II. Issues Resolved by or Related to *Silagy* and *Williams*

Notwithstanding any waiver arguments that might also apply, ten of Free's chal-

lenges to the constitutionality of the Illinois death sentencing scheme would appear either to be governed by or to have recently been resolved by the Seventh Circuit in *Silagy v. Peters,* 905 F.2d 986 (7th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), and by this court in *Williams v. Chrans,* 742 F.Supp. 472 (N.D.Ill.1990), *aff'd,* 945 F.2d 926 (7th Cir.1991). In *Silagy,* the Seventh Circuit specifically rejected the arguments that the Illinois death penalty statute and jury instructions unconstitutionally impose a presumption in favor of death (Ground 5) and shift the burden of proof to the defendant to overcome that presumption (Ground 6). *Silagy,* 905 F.2d at 997–99. Drawing upon that holding, we rejected the related argument that the failure of the Illinois sentencing scheme to assign a specific standard of proof as to the ultimate issue renders the scheme unconstitutional (Ground 14). *Williams,* 742 F.Supp. at 499–500. We additionally rejected the argument that the statute is unconstitutionally vague and fails to narrowly channel and guide the sentencing authority's discretion, thereby creating the impermissible risk that the death sentence will be imposed arbitrarily and capriciously (Ground 10). *Id.* at 500.

Further, the Seventh Circuit has concluded that the scheme is not unconstitutional for its failure to require written findings by the sentencing body setting forth any unspecified aggravating factors upon which it may have relied in reaching its decision to impose the death penalty (Ground 13). *Silagy,* 905 F.2d at 1000–01; *cf. Williams,* 742 F.Supp. at 501 n. 41. Nor is the scheme unconstitutional for its failure to provide for comparative review of death sentences (Ground 15). *Silagy,* 905 F.2d at 999–1000.

The Seventh Circuit has also upheld the death penalty scheme against three specific challenges to the prosecution's power to request a sentencing hearing: (1) that the prosecutor's discretion to seek the death penalty under the statute is standardless (Ground 2); (2) that the ability of the prosecutor to exercise such discretion under the statute vests in the prosecutor the judicial function of determining the appropriate

sentence (Ground 8); and (3) that the statute fails to provide for adequate notice to a defendant that the state will seek the death penalty and will present certain aggravating factors (Ground 7). *Id.* at 990–94. *But see* Daniel S. Reinberg, Comment, *The Constitutionality of the Illinois Death Penalty Statute: The Right to Pretrial Notice of the State's Intention to Seek the Death Penalty,* 85 Nw.U.L.Rev. 272 (1990).

Finally, in *Williams* we considered and rejected the argument that it was a denial of due process when three of the members of the Illinois Supreme Court upheld the constitutionality of Illinois' death penalty scheme by adhering to the common law doctrine of stare decisis rather than their expressed conclusions that the statute was unconstitutional (Ground 9). *Williams,* 742 F.Supp. at 502.

Concerning Grounds 2, 8–9, 13, and 15, Free has advanced no arguments in support of his challenges other than those which have previously been considered by the Seventh Circuit or by us. Accordingly, Free is not entitled to habeas relief on these grounds. Free has, however, raised a few additional matters with respect to Grounds 5, 6, 7, 10 and 14, which merit further consideration.

Regarding Grounds 5, 10 and 14, while Free's general arguments remain substantially the same as those rejected by the Seventh Circuit in *Silagy* and by this court in *Williams,* Free now proffers empirical evidence that has recently come to light which he claims factually refutes the judicial assessment in those decisions as to whether jurors are properly guided by the semantics of the statute. The evidence consists of a juror survey that was conducted in April 1990 by Professor Hans Zeisel and an affidavit by Professor Zeisel interpreting the results of that survey. Reply Exhibits G and H. This evidence was neither proposed, nor available for consideration either by the Seventh Circuit in *Silagy* or by us in *Williams.* If statistically reliable and unbiased, the results of the survey, as interpreted by Professor Zeisel, do call into question the empirical assumptions as to juror comprehension which

served as the predicate to the rulings in both of those cases.

Thus, the question we face is whether it is appropriate to consider such evidence as a means of supplanting those prior rulings. Although Free cites no case law on the question, he makes the compelling argument that a finding, which turns on how jurors comprehend the law they are told to apply, should be based if possible on substantial evidence rather than judicial speculation. Indeed, this very logic seems to have driven such landmark decisions as *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). At trial in several of the cases consolidated in *Brown*, several psychiatrists and social scientists testified as to the harmful effects of state-imposed segregation on black children. On appeal, appellants submitted a statement to this effect signed by 32 sociologists, anthropologists, psychologists, and psychiatrists who worked in the area of American race relations.[1] The Court most certainly drew upon this information as a substantial basis for overruling *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). *See Brown*, 347 U.S. at 494, 74 S.Ct. at 692 ("Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding is amply supported by modern authority.") (citations omitted).[2] Free has made a showing that he can adduce such evidence. Free thus places his challenge in a slightly different posture than that of the petitioners in *Silagy* and *Williams*.

Aside from simply citing to *Silagy* and *Williams* as controlling law, the respondents' only substantive objection to the consideration of this evidence is that it sheds no light on the question whether in Free's particular case the law was properly applied.[3] That proposition, however, is not

---

1. This statement is reprinted in *The Effects of Segregation and the Consequences of Desegregation: A Social Science Statement*, 37 Minn. L.Rev. 427 (1953).

2. At least one commentator has questioned the desirability of basing judicial decisions on social science data. *See* Edmond Cahn, *Jurisprudence*, 30 N.Y.U.L.Rev. 150, 157–58, 167 (1955), *cited in* William B. Lockhart, Yale Kamisar, Jesse H. Choper & Steven H. Shiffrin, *Constitutional Law* 1161 (6th ed.1986):

 "[S]ince the behavioral sciences are so very young, imprecise, and changeful, their findings have an uncertain expectancy of life. Today's sanguine asseveration may be cancelled by tomorrow's new revelation—or new technical fad. It is one thing to use the current scientific findings, however ephemeral they may be, in order to ascertain whether the legislature has acted reasonably in adopting some scheme of social or economic regulation; deference here is shown not so much to the findings as to the legislature. It would be quite another thing to have our fundamental rights rise, fall, or change along with the latest fashions of psychological literature."

 Apart from the fact that most observers would agree that the behavioral sciences are no longer as precariously perched as Cahn imagined in 1955, Cahn's analysis sheds no light on the problem this court presently faces. Free has not proposed the use of a social scientific study to create, eliminate or change a fundamental right. Rather, Free asks us to assess the validity of existing judicial conceptions that define the application of the immutable rights in question—a process amounting to nothing more than the ascertainment of whether the legislature has acted reasonably in the drafting of the Illinois death penalty statute.

3. Although not contesting the procedural posture of Ground 5, respondents argue that Grounds 10 and 14 were not raised before the state courts and thus are forfeited for the purposes of habeas review. We disagree. It is clear from Free's arguments on direct appeal challenging the constitutionality of the jury instructions that the Illinois Supreme Court was "fairly alert[ed] ... to any applicable constitutional grounds for" Free's current claims. *See United States ex rel. Sullivan v. Fairman*, 731 F.2d 450, 453 (7th Cir.1984). While it is true that Free did not explicitly label his argument on direct appeal as one of "vagueness," he did argue (1) that the jury should have been instructed that they could recommend imprisonment without finding any mitigating factors, and (2) that the jury should have been instructed on the various examples of court-sanctioned, non-statutory mitigating factors. Likewise, while Free in his initial appeal did not contend that the statute's failure to allocate a burden of proof as to the ultimate issue violates the Eighth and Fourteenth Amendments, he did argue that the jury should have been instructed that the prosecution bore the burden of proving beyond a reasonable doubt that no mitigating factors exist. To be sure, the Illinois Supreme Court, in *Free I*, unquestionably considered each of these issues in the light of the applicable provisions of the U.S. Constitution. *Free I*, 94 Ill.2d at 419–21, 69 Ill.Dec. at 21–22, 447 N.E.2d at 238–39 (citing such cases as *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *People v.

relevant to the particular challenges that Free has raised, and in any event, the proposition is not correct. The evidence is being offered to establish a basis for invalidating certain aspects of the statutory scheme under which Free was sentenced. Yet, if the statute is invalidated on the grounds asserted, that would also call into question the constitutional reliability of the sentence Free received. It is conceivable that evidence of the sort proffered by Free may alter our assessment as to whether jurors are likely to misinterpret the statutory language and instructions in a manner that creates an impermissible risk that a death sentence will be arbitrarily imposed or that diminishes the jury's power to spare a defendant's life on any mitigating factor. *See Williams*, 742 F.Supp. at 498 (citing *Gregg v. Georgia*, 428 U.S. 153, 185, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976)). We are therefore inclined to further explore this matter.

■ Free does not ask us to take this evidence at face value. Instead, he proposes an evidentiary hearing at which we may have the opportunity to fully explore the validity of the survey. Concluding that such a hearing is warranted, we refer the matter to Magistrate Judge Bernard Weisberg. Magistrate Judge Weisberg is to assess (1) the validity of the Zeisel study, and (2) its impact on each of the grounds (5, 10 & 14) for which it is offered as support. Due to the nature of this case and the need for expedited review, we request Magistrate Judge Weisberg to file a Report and Recommendation regarding this inquiry on or before February 1, 1992. This Report should include a transcript of the hearing before the Magistrate Judge along with any exhibits considered by him. Accordingly, we reserve ruling on Grounds 5, 10 and 14.

■ Regarding Ground 6, Free first reiterates a facial challenge to the death penalty statute on the ground that it unconstitutionally shifts the burden of persuasion against death to the defendant. Free offers no reasoning to circumvent the holding in *Silagy* on this point, and therefore that specific challenge fails. Free further contends, however, that, unlike *Silagy*, the prosecutor's argument at his sentencing hearing together with the jury instructions had the effect of imposing such a burden on him. Thus, he challenges the application of the statute under the particular circumstances of his case. However, having examined the passage from the prosecutor's closing argument to which Free refers (C. 8363–64, 8374) as well as the jury instructions given, we do not believe that they amount to the burden-shifting that Free claims. The prosecution simply and correctly indicated that it no longer had to prove anything beyond a reasonable doubt, but rather that the jury now faced an "open question." These remarks are consistent with the structure of the aggravation/mitigation phase of the sentencing hearing as a "weighing process in which presumptions and burdens of proof have very little meaning." *Williams*, 742 F.Supp. at 499. Accordingly, we deny Free's petition as it pertains to Ground 6.

■ With respect to Ground 7, Free further cites to the Supreme Court's recent decision in *Lankford v. Idaho*, —— U.S. ——, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991). Free's reliance on that decision is unavailing. In *Lankford*, the Court's holding that the petitioner was denied adequate notice that he might receive a death sentence turned, not on the fact that the earlier notice that the petitioner had received at arraignment and under the Idaho Code was

*Brownell*, 79 Ill.2d 508, 38 Ill.Dec. 757, 404 N.E.2d 181 (1980)).

In any event, even if we were to conclude that Free's present claims are procedurally defaulted, that bar must be avoided for cause and prejudice. *See Wainwright v. Sykes*, 433 U.S. 72, 91, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977); *United States ex rel. Spurlark v. Wolff*, 699 F.2d 354, 357–61 (7th Cir.1983) (en banc) (applying the *Wainwright* cause and prejudice

standard to cases when a state prisoner fails to raise a claim on his state court appeal). The evidence upon which Grounds 10 and 14 are based, the Zeisel study, was unavailable to Free at the time of his prior state court petitions. It is unrealistic to suggest that Free's counsel should have expended both the time and resources necessary to independently commission the study and develop the empirical evidence to support his claim on direct appeal.

insufficient, but rather that the events following the petitioner's conviction created the impression that the possibility of a death sentence had been eliminated as an issue at the sentencing hearing. *Id.* 111 S.Ct. at 1729. Thus, what rendered the death sentence constitutionally infirm in that case was the fact that the confusion with respect to precise issues to be decided at the sentencing hearing created an "impermissible risk that the adversary process may have malfunctioned." *Id.* at 1733. The possible malfunction was based on petitioner's counsel's apparent failure to make an appropriate presentation on behalf of his client at the hearing because counsel was not adequately on notice that "the real issue they should have been debating was the choice between life and death." *Id.* at 1729. At no point did the Court in *Lankford* suggest that the earlier notice provided either by the statute or at arraignment regarding the possibility of death as a punishment was insufficient. Hence, *Lankford* bears no relevance to Ground 7, and we accordingly deny Free's petition based on Ground 7.

### III. Constitutionality of the Proceedings Against Free

Free challenges the entirety of the proceedings against him by claiming that discriminatory zoning practices in DuPage County resulted in a denial of his Sixth Amendment right to an impartial jury (Ground 21). As a predicate for this claim, Free relies on *HOPE Inc. v. County of DuPage (Illinois)*, No. 71–0587 (N.D.Ill. Nov. 9, 1981), in which the district court found that DuPage County engages in intentional individual discrimination in its zoning practices. Free, further relying on *Holland v. Illinois*, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), contends that the district court's findings provide compelling evidence of discriminatory practices

that "prevented Free from enjoying his constitutional right to the opportunity to be tried by a jury drawn from a fair cross-section of the community." Reply at 58 (emphasis omitted).

 There are two principal problems with Free's argument. First, even assuming the *HOPE* decision may be given collateral estoppel effect for the purposes of Free's claim—a matter that Free does not address—the decision nevertheless was subsequently reversed by the Seventh Circuit, sitting *en banc*, because the plaintiffs lacked standing to bring the challenge. *See HOPE, Inc. v. County of DuPage, Ill.*, 738 F.2d 797 (7th Cir.1984). Accordingly, any findings of the district court are without effect.[4] Since Free exclusively relies on the district court decision as the predicate for his Sixth Amendment argument, the argument must therefore be rejected as lacking any evidentiary foundation. Second, although the Supreme Court's decision in *Holland* establishes an accused's right to a venire drawn from a fair cross section of the community, that decision does not provide authority for the right that Free claims to a venire drawn from a fair cross section of a racially balanced community. Accordingly, we deny Free's petition based on Ground 21.

### IV. Constitutionality of Free's Conviction

Free raises two challenges to his conviction. He first argues the trial court improperly refused to grant Free's motion to exclude evidence—a gun and a length of twine—that was allegedly seized in violation of his Fifth Amendment rights (Ground 20). The police had seized the gun and length of twine from Free's parents' residence pursuant to a warrant based in part on statements made by Free to the police at the time of his arrest outside the residence. Prior to his trial, Free filed a

---

4. Counsel for Free blatantly misstated the procedural history of the *HOPE* decision by citing that it was affirmed on appeal, and then that the appeal was vacated on other grounds. *See* Reply at 58. Yet, the majority opinion of the *en banc* panel made clear not only that the merits of the district court's decision were without effect, but the majority also suggested that the

merits of the decision were probably incorrect. *HOPE*, 738 F.2d at 816 (see in particular note 9); *cf. also id.* at 817 (Flaum, J. concurring). Although counsel is encouraged to vigorously pursue grounds for relief on behalf of habeas petitioners, such an endeavor does not excuse counsel's obligations to the court regarding the citation of case law.

number of motions, including a motion to suppress the statements made by him at the scene of the arrest and to suppress evidence seized from the residence. The trial court found that Free's statements were involuntarily made and granted the motion to suppress the statements for the purposes of trial. The trial court nevertheless allowed the statements to support probable cause for the search warrant and accordingly admitted the evidence procured under the warrant.

■ Ostensibly, Free's claim presents a Fourth Amendment issue which we are precluded from considering under *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Free, however, contends that his claim also presents a Fifth Amendment issue, not precluded by *Stone.* Free maintains that, in light of the Fifth Amendment violation of Free's right against compulsory self-incrimination, the trial court committed constitutional error when it refused to exclude the physical evidence derived from the involuntary statements as "tainted" under the "fruit of the poisonous tree" doctrine. Yet even assuming, without deciding, that this argument presents a Fifth Amendment violation properly reviewable in a petition for habeas relief, we find that the violation did not warrant exclusion of the evidence. Free's petition fails to make any reference to the finding of the Illinois Supreme Court in *Free I* that the magistrate who issued the warrant was presented with lawfully obtained information which sufficiently amounted to probable cause apart from consideration of the tainted information. *Free I,* 94 Ill.2d at 400–01, 69 Ill.Dec. at 10–11, 447 N.E.2d at 228–29. The Illinois Supreme Court concluded, and we agree, that since the warrant would have been justified excluding consideration of the involuntary statement, the admission of the evidence found pursuant to the warrant did not amount to constitutional error. *Id.* at 401, 69 Ill.Dec. at 11, 447 N.E.2d at 229.[5]

■ Free next contends that the trial court committed constitutional error when it admitted evidence concerning the victim's family during the guilt phase of the proceedings (Ground 19). Free claims that the disclosure of the following information led to an arbitrary and unfair conviction in violation of the Fifth and Fourteenth Amendments. First, the State made two references to Serpico's family during its opening statement. The prosecutor told the jury that Serpico and her husband had dinner with their children on April 23, 1978. (C. 4647). Serpico was also described to the jury as a "young housewife." (C. 4647). Second, during Mr. Serpico's testimony, and over defense counsel's objections, the prosecutor elicited that Mr. Serpico and his wife had been married for fourteen years. The jury was reminded of the children when Mr. Serpico testified that, on April 23, 1978, he and his wife took their two girls to dinner and then attended their godson's birthday party. (C. 4685–4686). Mr. Serpico also told the jury that Bonnie Serpico was survived by a sister who was pictured in a photograph he identified in court. (C. 4695–4696).

While apparently recognizing the danger of prejudice that may have been caused by the admission of such evidence, the respondents nonetheless contend that the remarks and testimony were not such as to cause the jury to believe the facts concerning Serpico's family to be material as to Free's guilt. That contention tracks the reasoning of the Illinois Supreme Court in *Free I.* Based on that reasoning, the court ultimately concluded that the statements were incidental and not calculated to unduly prejudice the jury in making its finding as to Free's guilt. *Id.* at 415, 69 Ill.Dec. at 17–18, 447 N.E.2d at 235–36. We concur in the analysis of the Illinois Supreme Court that, under the facts of this case, the admission of statements simply indicating that Serpico had a family were harmless with respect to the jury's ultimate determination of guilt.

5. In fact, even the trial court indicated that reliance on the involuntary statements was unnecessary to constitute probable cause for the issuance of the warrant in light of the other lawfully obtained evidence given to the issuing magistrate.

Accordingly, we deny Free's petition based on both Grounds 19 and 20.

## V. Constitutionality of State's Application of the Statute

██ Free challenges the manner by which the state enforces the death penalty statute by asserting what purports to be two claims (Grounds 11 and 12), jointly headed: "The Act as Applied Discriminates on Grounds of Race, Sex, Poverty and Against the Exercise of Fundamental Rights at Trial and Operates in an Arbitrary and Capricious Manner." While that heading suggests myriad constitutional violations, Free's essential argument is that the practices of the individual state's attorneys who prosecute capital cases results in an arbitrary and capricious infliction of the death penalty in violation of both the Eighth and Fourteenth Amendments.[6] Free did not raise these challenges to prosecutorial practices in the state courts. Thus, for the reasons fully set forth in *Williams*, 742 F.Supp. at 493–94, we find these claims waived.

In any event, the claims fail on their merits as well. Free asks for an evidentiary hearing in order to "show through scientific analysis that Illinois applies its Act in a manner that discriminates against at least three distinct groups of defendants." Reply at 36. Free also asks us to consider the responses of various state's attorneys' offices in Illinois in response to a Freedom of Information Act (FOIA) request, which allegedly demonstrate that "the various State's Attorneys apply inconsistent policies in deciding when to convene capital sentencing hearings." Reply at 37. Free asserts that this evidence will reveal that no objective or rational basis exists for

distinguishing the few cases in which death is imposed from the many cases in which it is not. *See Godfrey v. Georgia*, 446 U.S. 420, 427, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980); *see also Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

In an effort to distance his proffer and his claims from the similar Eighth and Fourteenth Amendment challenges rejected by the Supreme Court in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), Free maintains that his grounds for relief in these two sections are not based on an equal protection challenge to the Act and its application, but instead concern whether Illinois applies its statute arbitrarily and capriciously. Even accepting this distinction, however, only the first part of the *McCleskey* holding dealt with an equal protection claim.[7] *Id.* at 291–99, 107 S.Ct. at 1766–71. The second part of the *McCleskey* holding specifically dealt with the question as to whether evidence of disparate racial impact—similar to part of Free's proffer—could support a claim that a death penalty statute was being arbitrarily and capriciously applied so as to violate the Eighth Amendment (as applied to the states through the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962)). *McCleskey*, 481 U.S. at 299–320, 107 S.Ct. at 1771–82. *McCleskey* barred the Eighth Amendment challenge based on such proof.

██ Free, however, further attempts to distinguish his Eighth Amendment claim from the one rejected in *McCleskey* on the ground that he is not challenging the possible prejudices of jurors but the practices of the State's attorneys prosecuting each indi-

---

**6.** At one point in his argument, Free additionally invokes the Fifth and Sixth Amendments, but provides no explanation as to how those amendments might be applicable. Reply at 37. Accordingly, we disregard consideration of those two amendments in conjunction with Free's present claim.

**7.** Thus, while Free purports to be advancing two grounds for recovery, one based on the Eighth Amendment, the other based on the Fourteenth Amendment, it is evident that these grounds must be read together as one claim, since there is no basis for relief against the state based

solely on the Eighth Amendment without the requisite incorporation through the Fourteenth Amendment. If Free intended to obtain relief on a second ground that is based exclusively upon the Fourteenth Amendment, he has failed to offer a legal theory that would permit such relief. It may well be that Free originally meant to present an equal protection claim (his caption would suggest this). Assuming that to be the case, Free nevertheless effectively conceded the claim in his reply in light of *McCleskey*.

vidual case. Free's distinction apparently derives from a very narrow reading of the "as applied" portion of the Eighth Amendment analysis in *McCleskey* which primarily discussed the issue in terms of the likelihood of juror prejudice in sentencing. *Id.* at 308–12, 107 S.Ct. at 1775–78 (Part IV–B). When the opinion is seen in that narrow light, Free's challenge with respect to prosecutorial practices might be regarded as presenting a new issue. Yet, at least to the extent that Free seeks to establish that the exercise of prosecutorial discretion was arbitrary by relying on evidence of disparate impact, *McCleskey* cannot be read so narrowly as to be inapplicable. Though the Court tailored a portion of its discussion to juror discretion, the Court's ultimate decision to regard the evidence of disparate impact as constitutionally insignificant for Eighth Amendment purposes applied broadly across all of the discretionary stages of a criminal proceeding. *See id.* at 309–19, 107 S.Ct. at 1776–82.[8] Thus, Free's claim with respect to potential prosecutorial prejudice falls well within the broad ambit of the Court's rejection of disparate impact evidence for the purposes of establishing an Eighth Amendment violation.

Free finally claims that the FOIA survey of Illinois prosecutors demonstrates a constitutionally fatal lack of consistency regarding the basis upon which the prosecutors ultimately decide to seek the death penalty in a particular case. This argument, however, simply amounts to a challenge to the scope of prosecutorial discretion afforded state prosecutors under the statute in deciding whether the death penalty should be sought. As such, it serves only as a corollary to the one presented in Ground 2, and is therefore subsumed by the Seventh Circuit's finding in *Silagy* that the scope of prosecutorial discretion afforded by the Illinois statute was not violative of the Eighth Amendment. *Silagy,* 905 F.2d at 990–94. So long as any given prosecutorial decision is made within the parameters of the statute, the holding in *Silagy* encompasses the extent of discretionary variability that the survey of prosecutors might suggest.[9] Accordingly, we deny Free's 11th and 12th Grounds for habeas relief.

## VI. Constitutionality of Free's Sentencing Hearing

We next consider Free's challenge to the prosecution's use of victim impact evidence at the sentencing hearing (Ground 1). Free bases this challenge on the Supreme Court's decision in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). That decision, however, has been overruled by the Court's more recent decision in *Payne v. Tennessee,* —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Though the decision in *Payne* would appear plainly to bar Free's victim impact claim, Free contends that the validity of his *Booth* claim should not be affected by *Payne* because *Payne* is a "new rule" and therefore should not be applied retroactively.

Free's rather straightforward argument is as follows. Free cites to the criteria for determining whether criminal decisions should be applied retroactively which are set forth in the plurality decision of *Teague*

---

**8.** For example, the Court detailed the constitutional safeguards already in place to reduce the risk of racially motivated prosecutorial decisions. *Id.,* 481 U.S. at 309 n. 30, 107 S.Ct. at 1776 n. 30. Further, the Court specifically referred to prosecutorial discretion as one aspect of its decision to reject the petitioner's constitutional challenge to the discretion allowed decisionmakers in the sentencing system at issue. *Id.* at 311–12, 107 S.Ct. at 1177–78; *cf. also, id.* at 292, 107 S.Ct. at 1767 ("In its broadest form, McCleskey's claim of discrimination extends to every actor in the ... sentencing process, from the prosecutor who sought the death and the jury who imposed the sentence ...").

**9.** We note the distinction between our decision on this claim and our decision in Section II regarding the possible relevance of the juror survey to Grounds 5, 10, and 14. Free relies on the juror survey to directly attack the premise underlying the prior judicial interpretation as to the allegedly misleading nature of the statutory and instructive language. Here, however, the evidence concerning the practices of state prosecutors, even if uncontroverted, does not threaten the empirical soundness of the prior holding in any way—it simply demonstrates the range of discretion that the Seventh Circuit's decision in *Silagy* permits.

*v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989):[10]

> Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.

The Court explained that in general "a case announces a new rule when it breaks new ground or imposes a new obligation on the states or federal government." *Id.* 109 S.Ct. at 1070. Free points out that the Supreme Court has stated that a decision "that explicitly overrules an earlier holding obviously 'breaks new ground' or 'imposes a new obligation.'" *See Butler v. McKellar,* 494 U.S. 407, ——, 110 S.Ct. 1212, 1216, 108 L.Ed.2d 347 (1990). Free posits that since his case was final long before *Payne* was decided, and since the Court in *Payne* made clear that it was explicitly overruling the pertinent holding in *Booth,* then by the Court's own standard, *Payne* must be deemed a new rule which should not be given retroactive effect on collateral review. Free thus contends that his claim remains governed by the holding in *Booth*—a holding which, although it too was rendered after Free's case was final,

we recently found in *Williams* warranted retroactive application for the reasons set forth at length in that opinion. *See Williams,* 742 F.Supp. at 481–84.

On its face, Free's argument maps a somewhat bizarre procedural avenue toward obtaining habeas relief. Yet, notwithstanding its seemingly discordant procedural foundation, Free's argument cannot be dismissed simply as a mere contrivance. We find that his logic is firmly rooted in the at times beguiling approach to retroactivity that the Supreme Court has developed in recent years. *See id.* at 482–83. And were we to find his point ultimately persuasive, he might indeed have prevailed on his petition based on this claim, inasmuch as we find it likely that this claim is not procedurally barred[11] and it is fairly certain that the evidence admitted against him was clearly violative of *Booth.*[12] This said, however, we nevertheless conclude that *Payne* ultimately must control the disposition of this claim.

Although Free relies on the most easily comprehensible definition of what constitutes a new rule, alternative formulations of that definition by the Supreme Court may literally be read to support either the

**10.** As we noted in *Williams,* the holding in *Teague* was subsequently adopted by a majority of the court in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**11.** That conclusion is based largely on the Seventh Circuit's recent decision in *Rogers–Bey v. Lane,* 896 F.2d 279 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 93, 112 L.Ed.2d 65 (1990), which applied the "plain statement" rule of *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989):

> Under this standard, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in this case *clearly and expressly states* that its judgment rests on a procedural bar." 109 S.Ct. at 1043 (citations omitted) (emphasis added).

*Rogers–Bey,* 896 F.2d at 281. The procedural circumstances of *Rogers–Bey* were essentially identical to those present in Free's proceedings. Even if the Supreme Court's decision this past term in *Coleman v. Thompson,* —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) may be read as limiting, or even overturning *Harris, see Coleman,* 111 S.Ct. at 2569 (Blackmun, J. dissenting), the ultimate disposition of Free's claim

by the Illinois Supreme Court would "fairly appear ... to be interwoven with federal law." *Id.* at 2557; *see Free I,* 94 Ill.2d at 425–26, 69 Ill.Dec. at 24, 447 N.E.2d at 241–42 (proceeding without any comment or transition to consider the merits of Free's claim on both state and federal grounds, after holding that Free had waived his challenge to the admission of victim impact evidence by failing to properly object to it at trial). There is also a strong argument to be made that the contemporaneous objection rule does not provide an adequate state bar such that habeas review in this court would be foreclosed.

**12.** The Illinois Supreme Court has acknowledged that this evidence would have been barred by *Booth. Id.,* 122 Ill.2d at 375, 119 Ill.Dec. at 328, 522 N.E.2d at 1187. And engaging in our own review of the evidence, and based on the harmless-error analysis that is apparently required for such an inquiry, *see Williams,* 742 F.Supp. at 484–85, we are not confident that we could conclude beyond a reasonable doubt that the jury would have recommended a sentence of death had it not heard the extensive victim impact evidence presented at Free's sentencing hearing.

proposition that retroactivity doctrine is inapplicable to decisions such as *Payne*, or perhaps more affirmatively, the proposition that *Payne* should receive retroactive application, which perforce would trump the retroactivity of *Booth*. For example, if we consider one aspect of the general definition found in *Teague* (quoted above), we find that a case announces a new rule "if it imposes a new obligation." From the majority's perspective in *Payne*, its decision may be viewed as doing away with an obligation, rather than imposing a new one—namely, eliminating the requirement that courts prohibit the admission of victim impact evidence. Hence, it would be improper to say that what the Court was doing was announcing a new rule. Indeed, the message emanating from the recent series of decisions on retroactivity, *see Williams*, 742 F.Supp. at 481–83, is that the doctrine must be characterized as one of *non* retroactivity, the purpose of which is to erect a barrier to renewed petitions for habeas relief by persons who had been committed to custody in the past based on circumstance later found to be unconstitutional. That interpretation is consistent with the Court's "functional" gloss to the new rule inquiry: "The 'new rule' principle ... validates reasonable, good faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler*, 110 S.Ct. at 1217. Thus, when the matter being curtailed is a previously recognized right, and hence one that is no longer of constitutional importance, then the need to assess retroactivity falls by the wayside; the "new rule" need only supplant the old.

In a similar vein, application of yet another of the Court's articulations of what constitutes a new rule contradicts the application that *Free* would have us credit: "a case announces a new rule when the result was not dictated by a precedent existing at the time the defendant's conviction became final." *Teague*, 109 S.Ct. at 1070. Our

decision to retroactively apply *Booth* in *Williams* rested in part on the fact that the *Booth* majority made clear that its result was dictated by prior precedent. The *Payne* majority now claims that prior precedent did not compel the result reached by the *Booth* majority. Thus, one of the rationales upon which we relied for finding that *Booth* was retroactive, has now been undermined and hence may be used to negate that aspect of our prior holding.[13] Consequently, the same rationale may be relied upon as support for finding that *Payne* did not announce a new rule.

For that matter, *Payne* also undermines our conclusion that even if *Booth* did announce a new rule, *Booth* fell within the second exception to the nonretroactivity doctrine pertaining to the fundamental fairness and accuracy of the criminal proceeding. *Williams*, 742 F.Supp. at 484. Now, far from seriously diminishing the likelihood of obtaining an accurate conviction, *id.* at 484, the admission of victim impact evidence is regarded by a majority of the Supreme Court as an indispensable component of the sentencing inquiry into the defendant's character and the nature and circumstances of the crime. We should point out that this decisional change does not necessarily compel the opposite conclusion that, even if the rule announced in *Payne* is considered a new rule, it fits within the second exception. Conceivably, however, even the *Payne* rule may be read as going "directly to the 'truthfinding' function of the capital sentencing hearing—whether death is the appropriate punishment." *Williams*, 742 F.Supp. at 484.

All of this, of course, is to say that, given the competing and perhaps confusing tiers of analysis briefly suggested above, a principled application of the nonretroactivity doctrine may be impossible under the present circumstances. Indeed, the Seventh Circuit's recent decision in *Williams v. Chrans*, 945 F.2d 926 (7th Cir.1991) exposes the charade that is nonretroactivity

---

**13.** We reiterate, however, that the process of deciding whether a case was dictated by prior precedent, particularly one based on a "reasonable difference of opinion" standard, is fraught with the potential for logical inconsistency, a

matter exemplified by *Penry* and discussed at greater length by us in *Williams*, 742 F.Supp. at 483; *see also, Butler*, 110 S.Ct. at 1219–21 (Brennan, J., dissenting).

analysis. As William's conviction and death sentence became final after direct review in 1984, years before both *Booth* and *Payne*, a determination of the applicability of those decisions appeared to be inescapable. Yet, the court, without any discussion of retroactivity, applied the holding of *Payne* to uphold the constitutionality of William's sentencing hearing. *Id.* at 946–948. As such, the Seventh Circuit has merely supplanted the holding of *Booth* with that of *Payne*, leaving nonretroactivity analysis untouched. This is not to say, however, that *Payne* can be ignored, as Free would have us do. We must ultimately be guided by the more fundamental principles and purposes underlying the Great Writ, the most pertinent of which in this case is to insure that a sentence is imposed consistent with federal constitutional norms.[14] The Supreme Court has now told us that the introduction of victim impact evidence (of the type introduced against Free) does not violate any of those fundamental guarantees. Absent a prevailing basis for substantively concluding that the admission of victim impact evidence "so infect[ed] the sentencing proceeding as to render it fundamentally unfair," *Payne*, 111 S.Ct. at 2612 (O'Connor, J., concurring), we see no reason for further attempting to interpose the procedural vagaries of the nonretroactivity doctrine to sustain Free's claim. Accordingly, we must deny his petition based on Ground 1.

## VII. Constitutionality of the Illinois Death Penalty Statute as Applied to Free at Sentencing

### A. *Attempted Rape as a Statutory Aggravating Factor*

Citing *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), Free argues that he was deprived of his federal constitutional rights by an impermissible retroactive application of an expansive interpretation of the capital sentencing statute applicable in Illinois at the time Free committed the offenses (Ground 3). Free relies on the "basic principle [of due process] . . . that a criminal statute . . . give [a defendant] fair warning of the conduct" that could affect a person's liberty. *Id.* at 350–51; 84 S.Ct. at 1701.

The Illinois statute then in effect provided that a defendant found guilty of murder "may be sentenced to death if . . . the murdered individual was killed in the course of a felony . . . [and] the other felony was one of the following: armed robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary or the taking of indecent liberties with a child." Ill.Rev.Stat. ch. 38, § 9-1(b)(6) (1977). Free objected to the request for a death penalty hearing because he was neither charged nor convicted of rape, but only attempted rape. The trial court nevertheless found that Free was death-eligible by interpreting the list of aggravating factors to include the inchoate offense of attempt rape. Subsequent to Free's conviction but prior to a hearing of his appeal, the Illinois Supreme Court held that, in deciding whether a defendant is death eligible, the death penalty statute "does not require that the other felony be completed or that the defendant be charged with or convicted of the other felony or an attempted felony." *People v. Walker*, 91 Ill.2d 502, 511, 64 Ill.Dec. 531, 535, 440 N.E.2d 83, 87 (1982). In Free's appeal, the Illinois Supreme Court reaffirmed this interpretation of the statute and accordingly upheld the trial court's decision to permit a death penalty hearing. *Free I*, 94 Ill.2d at 418–19, 69 Ill.Dec. at 20–21, 447 N.E.2d at 237–38.

In *Bouie*, civil rights workers staged a sit-in demonstration at a segregated drug

---

**14.** For a similar argument that the "new law" doctrine is best analyzed as involving, not the "applicability vel non of "new" decisions, but the law of constitutional remedies," see Richard H. Fallon & Daniel J. Meltzer, *New Law, Non-Retroactivity, and Constitutional Remedies*, 104 Harv.L.Rev. 1733 (1991). "Within a remedial framework, the question whether to deny retroactive effect to a relatively unpredictable decision is properly governed 'not by metaphysical conceptions of the nature of judge-made law, nor by the fetich of some implacable tenet, such as that of the division of governmental powers, but by considerations of convenience, of utility, and of the deepest sentiments of justice.'" *Id.* at 1833 (citing Benjamin N. Cardozo, *The Nature of the Judicial Process* 148–49 (1921)).

store lunch counter in Columbia, South Carolina. After the protesters had entered the restaurant and requested service, an employee of the store put up a "no trespassing" sign. After being asked to leave the store and refusing, the protesters were arrested and convicted of criminal trespass. Under the South Carolina statute in effect at the time, a person must receive notice that entry was prohibited prior to entering a premises before he could be convicted of criminal trespass. In affirming the conviction of the protesters, the South Carolina Supreme Court apparently ignored 95 years of state court precedent and construed the notice requirement to cover cases in which a party was given warning that entry was prohibited after the party was already on the premises and then refused to leave. *Id.*, 378 U.S. at 363, 84 S.Ct. at 1707. The United States Supreme Court found that such a construction of a facially valid and precise statute amounted to an unforeseeable expansion and retroactive application of the criminal definition. Thus, the Court held that the protesters had been deprived of their right to notice under the Fourteenth Amendment. *Id.*

The respondents initially ask us not to consider Free's argument based on *Bouie* because, on appeal before the Illinois Supreme Court, Free did not alert the court to any applicable federal constitutional grounds for the claim. On direct appeal, Free argued that "the trial court erred in interpreting the death penalty statute in an improperly broad manner and in concluding that attempt could serve as an aggravating factor." Br. and Arg. of Def. at 87. Free therefore would appear to have only challenged the appropriateness of the trial court's construction of the statute as question of state law interpretation, thus barring the subsequent presentation of any federal claim in a habeas petition. *See U.S. ex rel. Sullivan v. Fairman*, 731 F.2d 450 (7th Cir.1984).

■ However, the Illinois Supreme Court's decision in *Free I* belies the respondents' assertion that the court did not consider any due process implications arising from Free's argument. The court charac-

terized Free's argument in a manner that, in certain respects, parallels his present argument: "[Free] argues that the indictment did not sufficiently inform him that the death penalty would be sought. The basis for this argument is that … although he was charged with attempted rape, [Free] argues that an attempt is not an aggravating factor." *Free I*, 94 Ill.2d at 418, 69 Ill.Dec. at 20–21, 447 N.E.2d at 237. Thus, the court framed the issue in terms of the propriety of notice to Free regarding the circumstances under which he would be death eligible. Accordingly, although Free may have neither specifically, nor artfully, raised the federal constitutional issue, it would appear that the Illinois Supreme Court undertook to analyze Free's claim from a federal due process perspective (though without the benefit of the case law to which Free now cites).

■ Assuming that the Illinois Supreme Court's treatment of the issue overrides any procedural bar to our consideration of this claim, we nevertheless find Free's reliance on *Bouie* to be unavailing. The statute at issue in this case, and the construction given to it by the Illinois courts, presents a different picture than the situation before the Court in *Bouie*. Unlike *Bouie*, the Illinois death penalty statute that was in effect at the time in question, was not a "facially precise" piece of legislation. Though not so imprecise as to be deemed impermissibly vague, the statute was ambiguous as to what exactly was meant by rendering a perpetrator death eligible if a murder was committed "in the course of" a certain felony. That language did not expressly require that the defendant actually complete the underlying aggravating felony or be charged and convicted with that crime. But then neither did it clearly state that "in the course of" included acts falling short of the actual commission of the offense. The Illinois Supreme Court had the authority to construe that language so as to lend the statute added precision. Yet, unlike the construction applied to the criminal trespass statute by the South Carolina Supreme Court in *Bouie*, the interpretation given the Illinois death penalty statute in *Walker*

was both reasonable and foreseeable.[15] From an adequacy of notice perspective, viewed at the time Free set about to commit the offenses for which he was ultimately convicted, we find that, had he engaged in the legal fiction of consulting the statute so as to order his behavior, he would have received "fair warning" of the possibly fatal consequences of his conduct.[16]

In section C of Ground 3, Free also seeks a new sentencing hearing based on the "improper use of attempt rape as an aggravating factor." Reply at 19–20. As we read this particular aspect of Ground 3, it appears to present a different issue than the one just discussed. Indeed, it goes to the validity of the interpretation itself—clearly a question of state law. A writ of habeas corpus, however, will not be issued on the basis of a perceived error of state law. *Jones v. Thieret*, 846 F.2d 457 (7th Cir.1988); *Buford v. O'Leary*, 727 F.Supp. 461 (N.D.Ill.1989). The federal issue that Free purports to raise in connection with this claim, regarding the provision of procedures for "saving the death penalty," arises only when a certain aggravating factor has been invalidated or otherwise found inapplicable. Since we have no authority to replace our interpretation of the state statute with that of the Illinois Supreme Court, and since we have found that the state court interpretation of the statute was properly applicable in Free's case, we reject Section C of Ground 3 as well. Ac-

cordingly, we deny Free's petition based on Ground 3.

### B. *Use of Unindicted Offense of Burglary as Aggravating Factor*

In a related argument, Free contends that the trial court violated his rights under the Sixth and Fourteenth Amendment by ruling that the prosecution could use the offense of burglary as an aggravating factor (Ground 4). Free's Sixth Amendment claim arises from the fact that the prosecution did not indict or try him for the offense of burglary, but sought only to later use the offense as an aggravating factor during sentencing. Thus, Free claims that he was deprived of his right to effective assistance of counsel because he did not receive adequate notice either that the death penalty would be sought or that the state would rely on the offense of burglary as an aggravating factor.

To the extent Free's argument rests on the purported requirement of "constructive notice" as to the possibility that the state might seek the death penalty, *see Silagy*, 905 F.2d at 995, we observe that there can be no doubt that burglary is clearly set forth as a statutory aggravating factor. In examining the circumstances surrounding the indicted murder, defense counsel was entirely capable of evaluating

**15.** In fact, prior to Free's conviction, other states had applied similar interpretations to death penalty statutes with "in the course of" language. *See, e.g., Amadeo v. State*, 243 Ga. 627, 255 S.E.2d 718 (1979), *cert. denied*, 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979).

We note our rejection of Free's reliance on later amendments to the act as evidence that the Illinois Supreme Court's interpretation was unforeseeable. In 1982, the Illinois legislature amended the Illinois statute to specify that the list of death-qualifying offenses includes "the attempt to commit any of the felonies listed in this subsection (c)." P.A. 82–1025, effective December 15, 1982. We can read nothing into this action by the legislature, or the comments by the governor cited by Free. Given the language of the former provision, the governor's critique and the subsequent amendment could just as easily be viewed as a clarification of the former provision, rather than as a substantive addition to its listed offenses.

**16.** This conclusion is not undermined by the Illinois Supreme Court's recent decision in *People v. Simms*, 143 Ill.2d 154, 157 Ill.Dec. 483, 572 N.E.2d 947 (1991). In *Simms*, the court held that a jury instruction including residential burglary among felonies which could support eligibility for the death penalty constituted plain error. In determining whether Free was provided adequate notice, however, this court is not faced with a situation where a petitioner's death penalty eligibility was based upon a felony not explicitly enumerated in ¶ 9–1(b)(6). Rather, the present issue turns on the reasonableness and foreseeability of the Illinois Supreme Court's construction of a felony specifically listed in ¶ 9–1(b)(6)—"murder[ ] ... in the course of ... rape." *See Walker*, 91 Ill.2d at 511, 64 Ill.Dec. at 535, 440 N.E.2d at 87; *see also supra* note 15.

whether that conduct might give rise to the enumerated aggravating offense of burglary.[17] Thus, defense counsel, at a minimum, should have possessed constructive notice that the death penalty might be sought based on such circumstances alone.[18]

Free nevertheless additionally maintains that the indictment should have specifically referred to, or even charged, the offense of burglary if the state intended to subsequently rely on it as an aggravating factor at sentencing. With respect to the substantive sufficiency of notice, however, if certain pretrial notice is not required as to whether or not the state will be seeking the death penalty in general, *Silagy*, 905 F.2d at 994–96, then perforce, the state is under no constitutional obligation to provide certain pretrial notice, whether by indictment or otherwise, as to the particular aggravating offenses upon which it may ultimately rely.

In any event, Free's counsel did receive certain pretrial notice that the state would be relying on burglary as an aggravating factor (and thus, Free plainly received certain, not simply constructive, pretrial notice of the state's intention to seek the death penalty). The record discloses that at least as early as the third day of jury selection, Free was specifically aware that burglary would be proved as an aggravating factor. (C. 3958). Therefore, any lingering doubt on the part of defense counsel as to the potential use of burglary as an aggravating factor would have been resolved prior to trial.[19] For this reason in particular, Free's further and renewed reliance on the Supreme Court's decision *Lankford* decision is misplaced. *Lankford*, —— U.S.

——, 111 S.Ct. 1723, 114 L.Ed.2d 173. Unlike petitioner's counsel in *Lankford*, whom the Court found could reasonably have believed that the sentencing hearing had been limited so as to preclude the possibility that death sentence might be imposed, Free's counsel not only was well aware generally that the death penalty would be at issue in the sentencing hearing, but he also knew which specific grounds upon which the prosecution would rely in seeking the death penalty.

 That fact does not end our consideration of Free's Sixth Amendment claim, however, since aspects of Free's argument may be read to challenge the sufficiency of the timing of any notice he received. Free's argument in this regard essentially is an "as applied" reiteration of the considerations central to the issue of the sufficiency of statutory notice in Ground Seven—namely that notice must be sufficient so as to permit defense counsel to make "informed decisions such as whether to waive any of numerous constitutional rights" and to enable defense counsel to "investigate an extraordinary array of factual issues relevant to the sentencing hearing." Reply at 22. Free, however, has failed to provide any basis in fact from which we might infer that the timing of the notice he received actually prejudiced his defense in the manner suggested. Accordingly, we reject his Sixth Amendment challenge.

 Free next contends that the use of burglary as an aggravating factor deprived him of his equal protection rights under the Fourteenth Amendment. Free

---

**17.** The impact of notice in this instance is therefore distinct from the notice issue discussed in the previous section, since here we are concerned with what defense counsel had reason to expect in preparing for trial. However, since the Illinois Supreme Court in *Free I* addressed the sufficiency of notice in terms that could be read to directly pertain to Free's Sixth Amendment claims, we shall not regard the matter as procedurally barred. *See Free I*, 94 Ill.2d at 418, 69 Ill.Dec. at 3–4, 447 N.E.2d at 220–21.

**18.** Further, as the Illinois Supreme Court indicated, and our decision in the previous section affirms, the attempt rape charge alone was suf-

ficient to put Free's counsel on notice of the potential penalty in this case. *Free I*, 94 Ill.2d at 418, 69 Ill.Dec. at 4, 447 N.E.2d at 221.

**19.** Indeed, at that time Free's counsel actively participated in a colloquy concerning whether state law allowed the prosecution to use unindicted felonies as aggravating factors at the penalty phase of a capital case. The trial court decided as matter of state law that the indictment did not have to contain every aggravating factor that the State would attempt to prove. That conclusion was implicitly affirmed by the Illinois Supreme Court's decision in *Free I*.

claims unequal treatment because he is subject to the death penalty for having committed murder during the course of a burglary, when the statute in effect at the time he committed the murder did not apply to persons who had committed murders during the "violent and more serious felony of home invasion." Reply at 22. The first problem with this argument is that Free failed to raise it both at trial and on direct appeal; therefore, he is procedurally barred from now raising the issue. The second problem with the argument, which perhaps explains Free's failure to raise the issue, is that, when Free committed his crimes in April 1978, home invasion was not a distinctly cognizable offense in Illinois. The crime of home invasion was added to the Illinois Criminal Code effective August 22, 1978. *See* Ill.Rev.Stat. ch 38, ¶ 12–11 (1978). Thus, in April 1978, there could not have been a class of persons who committed murders during the course of home invasion, but who received beneficially disparate treatment by not being subject to the death penalty. Therefore, the predicate for Free's equal protection claim did not yet exist. Accordingly, we reject Free's Fourteenth Amendment challenge, and thus deny Free's petition based on Ground 4.

VIII. Access to Post–Conviction Review

Finally, Free contends in Ground 16 that the death penalty statute denies persons sentenced to death equal access under the Illinois Post–Conviction Hearing Act, Ill.Rev.Stat. ch. 38, ¶ 122–1 (1979) ("post-conviction act"). That act provided that "any person imprisoned" had the right for twenty years after final judgment in a criminal matter to file a petition in the trial court for post-conviction relief. The Illinois legislature subsequently reduced the time for filing under the act to ten years, an amendment which the Illinois Supreme Court has held to be retroactive. *People v.*

*Bates,* 124 Ill.2d 81, 124 Ill.Dec. 407, 529 N.E.2d 227 (1988).

Free's equal protection argument is that, if Illinois executes him before November 28, 1993—the ten-year anniversary of the date final judgment was entered in his case—he will be denied the right to the full statutory period to challenge defects in his trial, a right which other, similarly situated non-capital prisoners are able to exercise. Free posits that, although Illinois was under no constitutional duty to offer its citizens post-conviction relief, once the State extended this right, it must not discriminatorily limit access to it. In support of this proposition Free relies on *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and the line of cases following it.[20] Free's application of this principle to the interrelation of the death penalty statute and the post-conviction act poses several issues for consideration.

We first observe that, while Free presents the question in terms of something being wrong with the death penalty statute, the question may just as easily be framed in terms of there being a constitutional infirmity with the application of the post-conviction act. This variant in possible perspectives highlights the fact that, at root, this claim does not implicate the constitutional validity either of Free's conviction or his sentence of death under the death penalty statute. Instead, the claim simply challenges the timing of when a death sentence may be carried out.

Furthermore, in Free's particular case, by no means is it a foregone conclusion that his execution will occur prior to the expiration of the ten year period for bringing post-conviction claims. Thus, in a sense, this claim may not truly be ripe from a standing perspective—Free cannot be a member of the affected class he identifies until he has exhausted or waived all avenues of post-conviction redress, and his ex-

**20.** These cases, including *Griffin,* generally concerned the right of indigents to certain forms of review and assistance that formerly were available only to those that could afford it. *See Burns v. Ohio,* 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959); *Smith v. Bennett,* 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). *See also, Long v. District Court of Iowa,* 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966).

ecution is scheduled to occur within the ten-year period.

In addition (and assuming that Free is certain to be executed within the ten-year period), as evidenced by *Free III*, any claims that could have been raised in an initial post-conviction petition are barred from further consideration in a subsequent petition. *See also*, Ill.Rev.Stat. ch. 38, ¶ 122–3. Thus, with respect to the bulk of any grounds for relief in the state court, Free has already exhausted his opportunity for further post-conviction relief.[21] On this point, Free nonetheless claims that he and other death row inmates, by virtue of a pending execution date, are necessarily compelled to immediately file a post-conviction petition and accordingly forego the opportunity of taking advantage of subsequent rulings in other cases that might arise within the ten-year period and that would afford relief under the post-conviction act. Free contends that non-capital inmates do not similarly have to operate in the "shadow of a needle or the electric chair," but may postpone their post-conviction filings if they so choose. The underlying premise of this point is problematic, however, since such a postponement would necessarily prolong the amount of time these non-capital prisoners might spend in jail. Therefore, it is hard to conceive that they would engage is such strategic behavior in the hope that a favorable circumstance might arise that is worth waiting for. Moreover, the right of any prisoner to rely on subsequent rulings in a post-conviction petition is limited to a large extent by the Illinois Supreme Court's holding that *Teague*, 489 U.S. 288, 109 S.Ct. 1060, applies to proceedings under the post-conviction act. *See People v. Flowers*, 138 Ill.2d 218, 149 Ill.Dec. 304, 561 N.E.2d 674 (1990). Thus, even if a non-capital prisoner chooses to delay the filing of his post-conviction petition, the purportedly beneficial chance of taking advantage of some later ruling of constitutional significance is quite remote. The only other opportunity that may prematurely be lost in a capital case is that

some time after execution, but prior to the ten-year expiration period, facts bearing upon a prisoner's innocence come to light that would otherwise have permitted the filing of a subsequent post-conviction petition. Such a situation cannot be treated lightly. Yet, here too the possibility of its occurrence must be regarded as a exceedingly remote.

Countering the significance of these possibilities, and as justification for any unequal treatment, the respondents advance a paramount state interest in "the timely enforcement of justice ... delivering justice as swiftly as is reasonable to the offender, future similar offenders and the victim(s)." Amended Answer at 51–52. In considering this interest, we reject Free's claim to being a member of a suspect class for equal protection purposes. The respondents' interest in possibly placing capital defendants in a situation where their statutory time for seeking post-conviction relief may be cut short need only be rationally based to survive constitutional attack. Under that standard of review, we must reject Free's claim. Recent developments in the Supreme Court support the rationality of the state's interest in swiftly executing inmates under a sentence of death at the expense repeated and protracted opportunities for post-conviction relief. *See, e.g.*, *McCleskey v. Zant*, —— U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). Accordingly, we deny Free's petition based on Ground 16.

## IX. Conclusion

We deny Free's petition based on Grounds 1–4, 6–9, 11–13, and 15–21. Magistrate Judge Weisberg is to conduct a hearing to assess (1) the validity of the Zeisel study, and (2) its impact on each of the grounds (5, 10 & 14) for which it is offered as support, and to file a Report and Recommendation regarding this inquiry on or before February 1, 1992. Accordingly, we reserve ruling on Free's petition with respect to Grounds 5, 10, and 14. This case is set for a status hearing before the court

---

**21.** Of course, in a literal sense, once an inmate is executed, he may no longer be deemed a "person imprisoned in the penitentiary," and

thus would no longer possess the status giving rise to the right to further post-conviction relief. Ill.Rev.Stat. ch. 38, ¶ 121–1 (1989).

on March 10, 1992, at 10:30 a.m. It is so ordered.